[Cite as *State v. Adkins,*, 2025-Ohio-5731.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                      Court of Appeals No.  OT-25-003

    Appellee                                   Trial Court No.  24 CR 80

v.

Ronald Adkins                                   **DECISION AND JUDGMENT**

    Appellant                                  Decided: December 23, 2025

\* \* \* \* \*

James J. VanEerten, Ottawa County Prosecuting Attorney,
Barbara Gallé, Assistant Prosecuting Attorney, for appellee.

Catherine R. Meehan, for appellant.

\* \* \* \* \*

**Zmuda, J.**

## I. Introduction

{¶ 1} Appellant, Ronald Adkins, appeals the judgment of the Ottawa County Common Pleas Court, sentencing him to a community control sanction following a jury trial. Finding no error, we affirm.

## II. Background and Procedural History

{¶ 2} On March 27, 2024, Adkins confronted his girlfriend, R.C., as she arrived home from a basketball game in Cleveland. Adkins was angry R.C. returned so late, and argued with R.C.'s sister and brother-in-law, who drove her home. R.C.'s sister exited the car to confront Adkins, and in the scuffle, R.C.'s sister fell back into the car door, causing it to close. R.C. convinced Adkins to go inside the home, and R.C.'s sister and brother-in-law drove to her father's home to call police.

{¶ 3} Officers Cochran and Englert responded first to Adkins' home, but R.C. informed police that Adkins left the home and was likely on foot or picked up by someone. R.C. did not permit officers to come inside and look for Adkins. Officers then went to R.C.'s father's home and took statements. R.C.'s sister reported that Adkins grabbed her by the neck/lower face and pushed her into the car door during the argument in Adkins' driveway. R.C.'s brother-in-law reported the argument but did not witness Adkins laying hands on his wife. Police left and Officer Englert obtained a warrant for Adkins' arrest from a judge.

{¶ 4} The next day, Adkins phoned R.C.'s father, angry that R.C.'s brother-in-law had called the police. R.C.'s sister was at their father's home, and she heard Adkins shouting into the phone, saying he would "bury" the brother-in-law. R.C. informed Adkins that she called the police and claimed that Adkins threatened to kill her before hanging up. R.C.'s sister called police, reporting the threatening phone call. Officers Englert and Miasek responded to take her statement, and R.C.'s sister informed officers

2.

that Adkins owned firearms. The officers proceeded to Adkins' home to take him into custody on the warrant from the previous night.

{¶ 5} Officers Englert and Miasek approached Adkins' home with Miasek's body-worn camera recording the scene. Officer Englert knocked and Adkins answered the door; Englert informed Adkins that they had a warrant for his arrest for assault. From the start of the encounter, Adkins was combative and irate. At first, Adkins refused to come out of his home, questioning why he had an arrest warrant and invoking his Fifth Amendment rights. As Adkins moved back inside the house, Officer Englert began to follow Adkins into the house to arrest him. Adkins responded, saying, "If you come into my house, we're going to go."

{¶ 6} Adkins remained just inside his doorway despite commands to come outside. Officer Miasek drew his taser and ordered Adkins to put his hands behind his back and come outside. Adkins gestured toward Miasek and his taser, saying, "I don't care about that fuckin' thing." As Adkins took a step towards Officer Englert, Officer Miasek deployed the taser at Adkins, and Adkins pulled the leads from his sweatshirt. After more commands, Adkins got to his knees, taunting Miasek, saying "You're a bitch, dude," and "I took that, didn't I?" Officer Englert secured Adkins in handcuffs, and as Officer Englert pulled Adkins toward the cruiser and tried to get Adkins to take a seat, Adkins continued to pull towards Officer Miasek and taunt him, calling him a "bitch" and threatening lawsuits. The officers took Adkins to the hospital to get medically cleared following the use of the taser.

3.

{¶ 7} Adkins was indicted on four counts: Count One, assault in violation of R.C. 2903.13(A) and (C), a misdemeanor of the first degree; Count Two, intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(B)(1) and (D), a felony of the third degree; Count Three, obstructing official business in violation of R.C. 2921.31(A) and (B), a felony of the fifth degree; and Count Four, resisting arrest in violation of R.C. 2921.33(A) and (D), a misdemeanor of the second degree. The charges in Counts One and Two related to Adkins' conduct toward R.C. and her family members. The charges in Counts Three and Four related to Adkins' encounter with the officers on the day of his arrest. Adkins appeared for arraignment and entered not guilty pleas to the charges.

{¶ 8} On November 5, 2024, the matter proceeded to a jury trial. The state presented the testimony of R.C., her sister, her brother-in-law, her father, and Officers Cochran, Englert, and Miasek. The jury entered not guilty verdicts for Counts One and Two, assault and intimidation of an attorney, victim, or witness in a criminal case. Therefore, as Adkins' convictions relate only to his encounter with the officers, we limit our summary of testimony to the testimony of Officers Englert and Miasek related to the charges for obstructing official business and resisting arrest.

{¶ 9} Officer Englert testified that he was leaving the judge's office after obtaining the arrest warrant for Adkins for assault, when he heard that officers were being dispatched to R.C.'s father's house once more. As a result, he responded to the address with Officer Miasek and investigated the incident regarding Adkins' phone call and

4.

alleged threats. After taking statements, Officers Englert and Miasek went to Adkins' house with the arrest warrant to take him into custody for the assault from the previous night.

{¶ 10} Englert testified that he knocked on Adkins' door, a man answered the door and Englert "explained that we had an arrest warrant for him." Englert testified that Adkins was upset and "cursing at us loud" and did not immediately comply, noting "there was a point where he stepped back towards the house as if he was going to enter and possibly shut the door and barricade himself." As Englert started to follow Adkins into the home, Adkins threatened to fight Englert. Eventually, Adkins stepped out and shut the door, took a step towards Englert, and Officer Miasek deployed the taser. When the taser had no effect, Englert drew his taser and ordered Adkins to the ground. Adkins complied and Englert placed Adkins in cuffs.

{¶ 11} After he was in cuffs, Englert testified that Adkins did not settle down, but instead he became more upset. Adkins continuously called Officer Miasek "bitch," which Englert characterized as a homophobic slur, and Adkins made comments about taking Englert's service weapon and shooting Englert in the head. Adkins continued to be loud and disruptive at the hospital, and "didn't really want to go with their program, so to speak, to get him in and out in a quick manner."

{¶ 12} Officer Miasek testified that he responded with Officer Englert to take statements regarding the phone call and then proceeded to Adkins' house to take Adkins into custody on the warrant. Miasek stated officers "had been given indication that there

5.

might be weapons in the home, firearms of some type." Miasek activated his body-worn camera and stayed further away from the front door as the "cover officer" while Englert knocked at the door. Almost immediately, Adkins started screaming at Englert, and Miasek testified Adkins moved to reenter the home, causing concern that Adkins would access a weapon. Miasek further testified that Adkins' threat to fight Englert was concerning, because "Adkins is a tall and large man and looks to be in rather good shape." Miasek also noted that police are restrained by rules in a physical confrontation, but Adkins had no such rules and could fight dirty, making Adkin's threats of physical violence even more serious.

{¶ 13} Miasek testified that they "asked several times for Mr. Adkins to turn around and place his hands behind his back" but Adkins refused and "continued to be verbally aggressive." Miasek remained concerned "with a possibility of [Adkins] having weapons inside the home that may be used to harm us or anybody else inside the home or somebody else around the home that we may not know about."

{¶ 14} When Adkins finally exited the home and closed the front door, Adkins stepped forward to Officer Englert.[1] Based on Adkins' prior comments and "his apparent willingness for a physical altercation with two police officers," Miasek drew his taser and ordered Adkins to turn and place his hands behind his back. When Adkins turned toward Miasek, Miasek fired the taser. The taser had no effect on Adkins, and Miasek dropped

_____

[1] Because of the camera angle, Englert is not visible on the recording when Adkins stepped forward.

6.

the spent cartridge and reloaded, noting Officer Englert now had his own taser out. At this point, Adkins finally complied and was handcuffed by Englert. Adkins was transported to the hospital to be medically cleared pursuant to policy following the use of the taser. Throughout the process, Adkins remained verbally abusive, threatened lawsuits and to come to Miasek's house, and used homophobic slurs toward Miasek. Miasek also testified that Adkins was disruptive at the hospital but mostly directed his disruptive and loud attention at Miasek, rather than at the hospital staff.

{¶ 15} At the close of testimony, the jury returned not guilty verdicts as to Counts One and Two, assault and intimidation of an attorney, victim, or witness in a criminal case. The jury found Adkins guilty of obstructing official business, with the additional finding of risk of physical harm to another, and resisting arrest. The trial court imposed a three-year community control sanction as sentence.

{¶ 16} Adkins filed a timely appeal of the judgment.

### III. Assignment of Error

{¶ 17} Adkins argues the following as error in his appeal:

1. The state failed to present sufficient evidence to establish appellant's guilt beyond a reasonable doubt.

2. Appellant's convictions were against the manifest weight of the evidence.

## IV. Analysis

{¶ 18} Adkins challenges his convictions for obstruction and resisting arrest, arguing a lack of sufficient evidence and that the convictions are against the manifest weight of the evidence. We address each assignment of error in turn.

### A. Sufficiency

{¶ 19} In his first assignment of error, Adkins challenges the sufficiency of the evidence as to each conviction. "Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law." *Toledo v. Manning,* 2019-Ohio-3405, ¶ 13 (6th Dist.). In reviewing a challenge based on sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Internal citations omitted) *State v. Smith,* 80 Ohio St.3d 89, 113 (1997). In reviewing sufficiency, we neither weigh the evidence nor assess witness credibility. *State v. Walker,* 55 Ohio St.2d 208, 212-213 (1978).

{¶ 20} Adkins was convicted on Counts Three and Four, obstructing official business in violation of R.C. 2921.31(A) and (B), a felony of the fifth degree; and Count Four, resisting arrest in violation of R.C. 2921.33(A) and (D), a misdemeanor of the second degree. The elements for each count are as follows:

{¶ 21} Obstruction official business in violation of R.C. 2921.31(A) and (B) requires proof of the following:

8.

(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

(B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree.

{¶ 22} Resisting arrest in violation of R.C. 2921.33(A) and (D) requires proof of the following:

(A) No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another.
…
(D) Whoever violates this section is guilty of resisting arrest. A violation of division (A) of this section is a misdemeanor of the second degree. A violation of division (B) of this section is a misdemeanor of the first degree. A violation of division (C) of this section is a felony of the fourth degree.

{¶ 23} In challenging the sufficiency of each conviction, Adkins argues the state failed to demonstrate that his "brief non-compliance based on his reasonable shock and surprise as to the officer's presence" was sufficient to demonstrate an affirmative act that created "substantial stoppage" of the officer's duties or presented a risk of physical harm, relative to obstructing official business. Adkins further argues that the state failed to present sufficient evidence of force or recklessness to support the resisting arrest charge.

{¶ 24} First, as to obstructing official business, Adkins disputes evidence demonstrating he "hampered or impeded" the officers' progress and he disputes evidence

9.

he presented a risk of physical harm. Adkins contrasts his case with those in which a defendant struggled with officers or fled, requiring officers to physically confront or pursue, arguing his arrest was quickly accomplished without Adkins impeding officers. While "R.C. 2921.31(A) does not criminalize every 'minor delay, annoyance, irritation or inconvenience,'" the term "'substantial stoppage' 'is not defined by any particular period of time.'" *State v. Hawkins,* 2024-Ohio-4516, ¶ 13 (6th Dist.), quoting *State v. Wellman,* 2007-Ohio-2953, ¶ 17-18 (1st Dist.) (additional citation omitted). "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties" *Hawkins* at ¶ 23, quoting *Wellman* at ¶ 12.

{¶ 25} Here, Adkins minimizes the evidence introduced at trial that showed he attempted to step back inside his home rather than comply, he threatened to fight the officers when they began to follow, and he remained argumentative, uncooperative, and hostile throughout his encounter at his home, while officers just wanted Adkins to comply with commands so they could take him into custody.[2] Based on Adkins' conduct, Officer Miasek deployed his taser, and Officer Englert readied his own taser while ordering Adkins to comply. While the entire sequence took minutes, the evidence – when

---

[2] Adkins also argues that the officers did not identify him as the person they came to arrest, but the record clearly demonstrates the officers informed Adkins they had a warrant for *his arrest*. As Adkins does not otherwise dispute the officers had a valid warrant, whether the arrest was lawful is not at issue on appeal.

10.

construed most favorably for the state – was sufficient to demonstrate both substantial stoppage and a risk of physical harm.

{¶ 26} The evidence, likewise, was sufficient to satisfy the elements of resisting arrest. Adkins argues that there was no evidence to support the finding he resisted arrest "in any way," let alone forcefully or recklessly. At the same time, Adkins acknowledges that he did not immediately comply but moved back toward his home, a "minor step backward." Adkins also argues he complied within "forty-five seconds of answering the door," he was complying when he was tased, and he was in handcuffs within one minute and seventeen seconds. However, the evidence demonstrates additional facts, not acknowledged by Adkins.

{¶ 27} The record shows Adkins knew he was under arrest, he ignored commands and threatened to fight Englert while stepping back into the house, and when Miasek aimed the taser at Adkins and ordered him to comply, Adkins stepped toward Miasek while dismissing the taser as "that fuckin' thing." After Miasek deployed the taser, Adkins ripped out the wires and taunted Miasek before finally obeying commands to kneel and place his hands behind his back. Miasek, furthermore, testified about the officer's apprehension and fear, based on Adkin's confrontational posture, threats, and apparent physical capabilities. This evidence was sufficient in satisfying the elements for resisting arrest. *See, e.g., State v. Shepherd,* 2015-Ohio-4330, ¶ 32 (5th Dist.), citing *State v. Deer,* 2007-Ohio-1866, ¶ 34 (6th Dist.) (sufficient evidence where defendant knew he

11.

was under arrest but backed up into another room, told officers to get out, and continued ignoring commands after the first taser).

{¶ 28} Accordingly, Adkins' first assignment of error is not well-taken.

**B. Manifest Weight**

{¶ 29} In his second assignment of error, Adkins argues his convictions for obstruction of official business and resisting arrest are against the manifest weight of the evidence. In reviewing a challenge based on manifest weight, we "weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Hawkins,* 2024-Ohio-4516, at ¶ 9 (6th Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). Unlike sufficiency review, we do not construe the evidence in the state's favor, but "sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *Hawkins* at ¶ 9, quoting *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388.

{¶ 30} In this case, the jury considered the officer's testimony and video from Officer Miasek's body-worn camera. In the video, Adkins is confrontational, argumentative, and angry. He threatens to fight Englert if he pursues Adkins into the home and tells Miasek he is not afraid of getting tased, all while refusing to comply with commands as officers attempted to take him into custody on the arrest warrant. Adkins, however, argues that the video suggests "a lack of knowledge of the circumstances and,

12.

thus, a lack of aggression," characterizing Adkins' posture as relaxed and not aggressive, contradicting Miasek's testimony that Adkins' appeared ready to start a physical confrontation.

{¶ 31} As previously addressed, the hindrance element for obstructing official business concerns whether a defendant's conduct affects the officer's ability to perform official duties. *Hawkins* at ¶ 23, quoting *Wellman,* 2007-Ohio-2953, at ¶ 12. The risk of physical harm, moreover, can arise from attempts to restrain an uncooperative suspect or be demonstrated by the need to use a taser. *State v. Singh,* 2018-Ohio-3473, ¶ 14 (9th Dist.). In this case, the state presented evidence that, if deemed credible, supported the jury's verdict on obstructing official business with a special finding of risk of physical harm.

{¶ 32} Similarly, the record contains credible evidence to support the jury's verdict on resisting arrest. Considering the video evidence along with testimony, the jury did not clearly lose its way in finding Adkins hampered and impeded the officers' attempts to take him into custody, resisting the arrest, and that Adkins threatened the officers with physical violence, resulting in Miasek deploying his taser and Englert holding his taser at the ready in securing Adkins' arrest. *See, e.g., State v. Jasso,* 2023-Ohio-209, ¶ 17 (6th Dist.) (defendant did not comply with orders to put his arms behind his back when informed of warrant for his arrest, but resisted attempts to secure his arms, resulting in use of the taser).

13.

**{¶ 33}** Based on the record, therefore, a rational fact finder could have found Adkins obstructed official business with a risk of physical harm, and that Adkins resisted arrest. Adkins' second assignment of error, accordingly, is not well-taken.

## V. Conclusion

**{¶ 34}** Finding substantial justice has been done, we affirm the judgment of the Ottawa County Common Pleas Court. Adkins is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

JUDGE

Christine E. Mayle, J.

JUDGE

Gene A. Zmuda, J
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.